# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARIA C. NAVARINO,**

        **Plaintiff,**

**-vs-**                                                           **Case No.  6:05-cv-1856-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Maria C. Navarino, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

(SSA).  Doc. No. 15.  Pursuant to the consent of the parties, this matter has been referred to me for

disposition under 28 U.S.C. § 636(c).  Doc. Nos. 10, 12.[1]

### I.      PROCEDURAL  HISTORY.

In July 2002, Navarino applied for disability benefits under the Federal Old Age, Survivors

and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental

Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.*,

---

[1] In her memorandum, Navarino requests oral argument.  Doc. No. 22.  The Scheduling Order in this case, doc. no. 17, provides that oral argument must be requested by separate motion.  In any event, after review of the memoranda filed by the parties and the record in this case, I conclude that oral argument is not necessary.

(sometimes collectively referred to herein as the Act).  R. 57-59, R. 206-10.  The applications

alleged that Navarino became disabled on June 27, 2002.  *Id*.  Navarino's applications were denied

initially and on reconsideration. R. 22-24, 40-43A,[2] 200-05.

Navarino made a timely request for a hearing before an administrative law judge (ALJ).  R.

39.  An ALJ held a hearing on February 22, 2005.  Navarino, represented an attorney, testified at

the hearing. Mark Capps, a vocational expert (VE), also testified.  R. 223-51.

After considering the testimony and the medical evidence presented, the ALJ determined

that Navarino was insured under OASDI through the date of his decision. R. 18. The ALJ found

that Navarino had not engaged in substantial gainful activity since her alleged onset date of

disability.  *Id*.

The ALJ concluded that the medical evidence showed that Navarino had disorders of the

spine, chronic obstructive pulmonary disease (COPD), anxiety, hypertension, and arthritis, which

were severe impairments.  These impairments did not meet or equal any of the impairments listed

in the applicable social security regulations (the Listings).[3]  *Id*.

The ALJ concluded that Navarino had the residual functional capacity (RFC) to perform a

range of sedentary to light work.  Specifically, she could lift and carry up to ten pounds frequently,

and could stand for two hours and sit for at least six hours in an eight-hour workday "given a

---

[2]  The record contains intermittent pages labeled __A.  These pages immediately follow the record page to which the "A" page is appended.

[3]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

sit/stand option with 15 minute cycles." She could occasionally bend, crouch, kneel, stoop, squat, or crawl, but must avoid ladders and unprotected heights, operation of heavy machinery, concentrated dust, fumes or gases, unusual stress, and work requiring repeated twisting of the neck greater than thirty-two degrees of forward flexion.  R. 18-19.

In reaching this conclusion, the ALJ found Navarino's testimony about the limitations arising from her impairments was not totally credible because she "describes a series of symptoms that are far in excess of that which is demonstrated by the medical evidence of record."  R. 15.  In support of this conclusion, the ALJ cited two physical residual functional capacity assessments, and treatment notes from consulting physicians.  R. 15-16.

Because Navarino's past relevant work required more than her RFC would permit, the ALJ concluded that Navarino could not return to her past relevant work as a retail store manager and assistant manager.  R. 16.  Relying on the testimony of the VE, and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Navarino could make a vocational adjustment to other work, including mail clerk, ticketer, surveillance system monitor, or call-out operator.  R. 19.  Therefore, the ALJ concluded that Navarino was not disabled.  *Id*.

Navarino requested review of the ALJ's decision. R. 8.  She also submitted additional records from a physician.  R. 7; *see also* R. 211-20.  On September 2, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 4-6. Navarino timely sought review by this Court.  Doc. No. 1.

## II.     JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals

Council denied Navarino's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir.

1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42

U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.     STATEMENT OF FACTS.

*A.     Evidence from Navarino.*

Navarino was born August 24, 1962.  R. 225A. Navarino previously worked as a manager

at retail stores, including convenience and drug stores.  R. 66, 75-78, 227, 229-30.  She managed

between six and eight employees.  R. 230.   As Navarino began to experience the symptoms

discussed herein, she began to miss time at work due to pain.  R. 234.

Navarino stopped working after developing numbness and shaking in her hands, which

lead to difficulty counting money and operating a computer.  R. 91, 227-28.  Her fingers twitched

due to muscle strain, and she had difficulty forming a fist.  R. 237. She also had pain in her

shoulders.  R. 91, 237.

She experienced neck pain and swelling, which was exacerbated by standing, bending and

turning her head.  R. 234.  It hurt her neck to look at a computer monitor.  R. 228. It hurt to turn

her head from side to side or up and down.  R. 237.  She experienced headaches nearly every day.

R. 88, 237-38.  On days when she had bad headaches, Navarino tried to nap.  R. 239.  She

estimated that she had five bad days per week.  *Id*.

Navarino also indicated that she had lack of sensation in her right foot, R. 85, and sensitivity to light and cold, R. 88-89.  She had hammer toes and great toe deformity, which caused pain and prevented her from bending her toes.  R. 237.   Navarino estimated she could sit for approximately ten minutes before developing lower back and foot pain; could stand for approximately ten minutes before developing lower back and hand pain; and could walk for approximately ten minutes.  R. 238-39.   She needed to move after ten to fifteen minutes of sitting. R. 239.

Navarino took medication for pain, migraine headaches, anxiety, and depression, among other things.  R. 228-29.  The medications offered only some relief.  R. 229.  She initially experienced some stomach discomfort as a side-effect of one medication.  *Id*.  She had lost her balance, which she attributed to side-effects of medication.  R. 240.

Navarino lived in a home with her adult son and mother.  R. 226, 231.  When the ALJ asked what Navarino did to fill her time, she responded "I rarely do anything anymore."  R. 230. Her mother did housework, laundry, and grocery shopping.  R. 230, 232.  Navarino rarely cooked, and did not wash the dishes, make the bed, vacuum, sweep, mop, take out the trash, or do yard work.  R. 231.  She read for about thirty minutes per day.  R. 231.  She did not watch television, listen to music, do crossword puzzles, or spend time on the computer.  R. 232.  She did not have any hobbies at the time of the hearing.  R. 232.  She did not go to church or visit friends or relatives.  R. 233.

Navarino had a driver's license but had not driven in two-and-a-half years.  R. 233.  She stopped driving because she could not look behind her and the vibration of the wheel hurt her

hands.  R. 239.  Her mother drove her to the hearing.  R. 233.  She could bathe, shower, and dress

herself.  R. 233; *but see* R. 83, 86 (indicating difficulty in bathing, using a hair dryer, and

buttoning clothing).

Navarino frequently did not leave her home and had stayed in her home for as long as five

months at one time.  R. 236.  She often would not dress during these times.  *Id*.  She also

experienced difficulty breathing when leaving the house because of panic attacks.  R. 233.  She

had been prescribed Paxil for these panic attacks, and to help with a case of boils that her doctor

opined was due to "nerves."  R. 235.  She had also been prescribed amitriptyline for help relaxing

and sleeping.  *Id*.  While she testified that she could leave her home to work, she did not believe

that she would be able to work every day.  R. 240.

B.      *Vocational Expert Testimony.*

The ALJ posed the following hypothetical question to the VE:

> Assume . . . the claimant is 42 years old, has a high school
> education.  Assume further that she could perform light work but is
> further limited by the following exertional limitations.  She has a 10-
> pound maximum lifting capacity.  She needs to avoid repetitive
> twisting of the neck.  She needs to avoid ladders and unprotected
> heights.  She needs to avoid operation of heavy moving machinery.
> She needs to avoid unusual stress.  She can only occasionally bend,
> stoop, crawl, kneel, or crouch, and she needs to avoid concentrated
> dust, fumes or gases.

R. 243-44.  Based on this hypothetical question, the VE opined that the hypothetical claimant

could likely perform Navarino's past relevant work, depending on the nature of the subjective

restriction on twisting of the neck.  R. 244.

-6-

The ALJ then added a "sit/stand option, 15-minutes cycles, and her maximum of standing

and walking in an eight-hour-day was limited to two hours a day." *Id*.  The VE opined that that

this additional limitation should not preclude Navarino from performing her past relevant work.

R. 244-45.

The ALJ then asked the VE to opine whether there were any unskilled, entry-level

positions the claimant could perform with the limitations previously described.  R. 245.  The VE

testified that even with these restrictions, the claimant could perform the following work: mail

clerk, DOT 209.687-026, which is light unskilled work; ticketer, DOT 229.587-018, which is light

unskilled work; surveillance system monitor, DOT 379.367-010, which is sedentary unskilled

work; and call-out operator, DOT 237.367-014, which is sedentary unskilled work.  R. 245-46.

Navarino's attorney asked the VE to assume that the claimant would also have difficulty

looking down.  R. 248.  The VE opined that, with these combination of restrictions, the claimant

would not be able to perform the call-out operator or ticketer jobs.  *Id*.  However, the claimant

would be able to perform the surveillance system monitor job.  *Id*.  The VE also opined that if any

employee had more than one or two unexcused absences during a probationary period, she would

likely be terminated.  R. 249.

    *C.*    *Medical Records.*

    1.    Records Before the ALJ.

In April 1997, J. Richard Ryals, M.D., read an MRI of Navarino's cervical spine.  R. 99-

100.  His impression was bilateral cervical radiculopathy due to herniated nucleus pulposus[4] in the

---

    [4] Herniated nucleus pulposus, also called a slipped disk, occurs when the soft portion of the intervertebral disk is forced through a weakened part of the disk.  Medline Plus, *Herniated nucleus*

cervical spine with concave defect in cervical spinal cord, and a small spur on some of the lower cervical vertebrae. *Id.*

Emergency room records from August 1999 indicate that Navarino was seen for chest pain. She told the examining physician that she always had head pain related to herniated disc disease in her neck, but that it was not different than usual. R. 192-94.  The diagnoses were costochondritis[5] and degenerative joint disease of the neck. R. 195.

In March 1999, K. Kevin Shamlou, M.D., read an MRI of the cervical spine.  His impression included small and moderate herniated nucleus pulposes. R. 115.

Beginning at least by February 2, 2000, Navarino was treated by Alyn L. Benezette, D.O., for complaints of constant headaches.  Upon examination, Dr. Benezette observed spasm and tenderness of the paraspinous muscles.  He treated Navarino with pain medication and a TENS unit. R. 112.

Navarino returned to Dr. Benezette in May 2000.  She reported that she no longer suffered from the headaches, but was then experiencing problems with her right foot. Dr. Benezette observed that she walked with a mild limp.  He recommended nerve conduction studies. R. 111.

In June 2000, Navarino complained of aggravation of neck pain and headaches after swimming. R. 110.  Dr. Benezette observed swelling of the soft tissue of the head and neck that resulted in a significant restriction of motion in the spine. R. 110.  He also observed continuing

---

*pulposus (slipped disk)*, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited Mar. 1, 2007).

[5] Costochondritis refers to "[i]nflammation of one or more [rib] cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate, but without . . . local swelling . . . ." STEDMAN'S MEDICAL DICTIONARY 403 (26th ed. 1995) (hereinafter STEDMAN'S).

problems in the right foot.  R. 110.  His impression was cervical strain with occipital neuralgia,[6] and possible tarsal tunnel syndrome of the right foot.[7]  *Id*.

In October 2001, Dr. Benezette saw Navarino for follow up regarding her occipital neuralgia.  R. 109.  Navarino reported that she had little relief from medication.  Dr. Benezette observed some swelling and adjusted her medications.  *Id*.  Later that month, he observed that the medication helped, and "[s]he comes in feeling a lot better.  She states she is back to her baseline."  R. 108.  Dr. Benezette was happy with her progress.  *Id*.

In May 2002, Navarino again returned to Dr. Benezette complaining of head pain not relieved by medication.  Upon examination, Dr. Benezette observed continuing tenderness and mild spasm in the occipital area and mild restriction of motion in the cervical spine.  His impression was lesser occipital neuralgia, for which he recommended nerve blocks in addition to medication.  R. 107.

In June 2002, Sanjay Sastry, M.D., saw Navarino regarding her headaches at the request of Dr. Benezette.  R. 106.  Dr. Sastry observed mild tender points in the occipital area.  His impression was lesser occipital neuralgia causing suboccipital headache, right side greater than

---

[6]  "Occipital neuralgia is a distinct type of headache characterized by piercing, throbbing, or electric-shock-like chronic pain in the upper neck, back of the head, and behind the ears, usually on one side of the head."  National Institute of Neurological Disorders and Stroke, *NINDS Occipital Neuralgia Information Page*, http://www.ninds.nih.gov/disorders/occipitalneuralgia/ occipitalneuralgia.htm (last visited Mar. 1, 2007).

[7]  Tarsal tunnel syndrome "is a compression, or squeezing, on the posterior tibial nerve that produces symptoms anywhere along the path of the nerve.  The posterior tibial nerve runs along the inside of the ankle into the foot."  It is similar to carpal tunnel syndrome.  Am. College of Foot and Ankle Surgeons, *Tarsal Tunnel Syndrome*, http://www.footphysicians.com/footankleinfo/tarsal-tunnel-syndrome.tem (last visited Mar. 1, 2007).

left. *Id*.  He administered nerve blocks, which resulted in immediate pain relief.  R. 105; *see also*

R. 103.  On June 19, 2002, Navarino reported that she no longer had headaches.  R. 103.

However, her head pain returned in July, 2002.  R. 102.  Dr. Benezette again prescribed pain

medication.  R. 101.

Meanwhile, in June 2002, Ronald I. Landau, M.D., saw Navarino for chronic neck pain.  R.

113-14.  His impression was straightening of the cervical spine, suggestive of underlying

musculoligamentous strain, disc bulging and herniation, and bilateral neuroforaminal stenosis.[8]  R.

114.

In July 2002, Dr. Sastry saw Navarino for follow up on her occipital neuralgia.  R. 102.

She was still doing well following the injection, but had developed some pain on the left side.  *Id*.

Dr. Benezette also saw Navarino for follow up, and observed relief from the injections.  R. 101.

In January 2003, Darwin Caraballo, M.D., saw Navarino at the request of the SSA.  R. 132-

36.  Dr. Caraballo observed that she complained of neck pain, left shoulder pain, and right ankle

and foot pain.  R. 132.  Her medical history indicated herniated disc, hypertension, and high

cholesterol.  *Id*.  X-rays of the left shoulder were unremarkable, and other than a small spur on the

heel, X-rays of the feet were unremarkable.  R. 134.  She had full range of motion in upper and

lower extremities, and her gait was normal.  *Id*.  Dr. Caraballo observed some osteoarthritic

changes of the cervical spine, chronic osteoarthritis related pain of the shoulders and wrist,

hammer toe deformity bilaterally, and bunion deformity of the great toe.  R. 135. He recommended

---

[8] Neuroforaminal stenosis refers to a narrowing of the spine, which causes compression of the nerve roots.  Medline Plus, *Spinal stenosis*, http://www.nlm.nih.gov/medlineplus/ency/article/000441.htm (last visited Mar. 1, 2007).

that she be evaluated by an orthopedic surgeon or podiatrist, and for rheumatoid arthritis, and that she take pain medication. R. 135. He opined that there was "no need for this patient to be off duty." R. 135.

In July 2003, Navarino was seen at the offices of Reginald Q. Bowden, M.D. R. 178-79. She complained of neck pain and headaches, and hypertension. R. 178. The assessment was hypertension, headaches, polyneuropathy,[9] weakness, and facial edema,[10] among other things. R. 178; *see also* R. 167-70 (records from August 2003).

In September 2003, Navarino returned to Dr. Bowden's office complaining of headaches and swelling. R. 163. The assessment was headaches and arthritis, with a recommendation to limit caffeine intake. *Id.* She also sought emergency room treatment in September 2003, for complaints of headaches, neck pain and swelling. R. 189-91. The diagnoses were degenerative changes in the cervical spine, headache, and increased blood pressure. R. 191. Records from Dr. Bowden's office in November 2003 indicate that her headaches improved. R. 161.

In February 2004, Navarino returned to Dr. Bowden, still complaining of headaches. R. 159. She was treated with Paxil and Elavil and $B_{12}$. *Id.* As of April 2004, Navarino reported improvement in ther headaches. R. 157; *see also* R. 154 (headaches improved as of August 2004).

---

[9] Polyneuropathy refers to "[a] disease process involving a number of peripheral nerves" or a "generalized disorder of peripheral nerves . . . ." It has various causes. STEDMAN'S at 1404.

[10] Edema refers to an "accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities." STEDMAN'S at 544.

-11-

Emergency room records from March 2004 indicate that Navarino was seen for a boil or abscess on her face.  R. 186-88.  Navarino reported that her primary physician told her that she had anxiety-induced dermatitis.  R. 187.

In August 2004, Gregory M. Lower, D.O., a diplomat of the American Board of Orthopedic Surgery, examined Navarino at the request of the SSA.  R. 140-49.  Navarino reported that household chores requiring repetitive upper extremity handling increased her neck pain and headaches, and that standing for protracted periods increased the pain and swelling in her foot.  R. 140.  Dr. Lower noted that Navarino had a long-standing history of cervical degenerative disk disease and tarsal tunnel syndrome of the right foot, as well as conservative management of occipital neuralgia.  *Id*.  Navarino reported that she had not had active treatment for two years due to financial constraints, among other things.  *Id*.

Upon examination, Dr. Lower observed that Navarino had a mildly antalgic gait, but walked without an assistive device.  R. 142.  An x-ray revealed a deformity associated with osteoarthritis of a join in her right foot.  R. 143.  Dr. Lower's impression was cervical degenerative disk disease with mild left upper extremity radiculopathy, moderate mechanical neck pain secondary to the degenerative disk disease, bunions with associated joint osteoarthritis, and moderate tarsal tunnel syndrome in the right foot with loss of range of motion in all toes.  R. 144.  Dr. Lower opined that Navarino's cervical degenerative disk disease "would give her difficulty with overhead material handling, or lifting greater than 10 pounds. [Her] right foot would give her difficulty with standing for protracted periods of time or walking long distances. [She] is rated as a limited community ambulatory without the aid of an orthopedic assistive device."  *Id*.

-12-

Based on the foregoing, Dr. Lower completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which he indicated that Navarino could not lift more than ten pounds, could stand or walk for at least two hours in an eight-hour workday, and that her ability to sit was unaffected.  R. 145-46.  She would have occasional limitations in climbing, balancing, kneeling, crouching, crawling, and stooping.  R. 146.  She had no manipulative, visual/communicative, or environmental limitations.  R. 147-48.

In August 2004, J. Hirschman, whose credentials are not indicated, observed that Navarino had limited (32°) forward flexion of the cervical spine, moderate spasticity of the cervical spine and mild spasticity of the lumbar spine.  R. 150.  She had a mildly antalgic gait.  R. 152.

Also in August 2004, records from Dr. Bowden's office indicate that Navarino's hypertension was well controlled, but that she continued to experience chronic headaches.  R. 154.

In November and December 2004, Michael D. Kohen, M.D., saw Navarino for shortness of breath.  R. 198-99.  The impression after a forced vital capacity test  was "compatible with mild restrictive lung disease."  R. 198.

2.      Records Submitted After the Hearing.

Records submitted to the Appeals Council indicate that in November and December 2004, Navarino was seen at Dr. Bowden's office for shortness of breath, gastroesophageal reflux disease, and hypertension, among other things.  R. 213, 217.  In December 2004, Dr. Bowden also noted that Navarino experienced anxiety, and he prescribed Paxil and Buspar.  R. 213. Records from February 2005 indicate that Navarino had difficulty tolerating Paxil, and was experiencing hypertension and anxiety.  R. 211.

   *D.      Reviewing Professionals.*

   In September 2002, Harry L. Collins Jr., M.D., completed a Physical Residual Functional

Capacity Assessment.  R. 116-23.  He observed that Navarino's principal complaint was occipital

neuralgia.  R. 117. He indicated that Navarino could occasionally lift up to twenty pounds,

frequently lift up to ten pounds, stand, walk, or sit for up to six hours in an eight-hour workday.

*Id*.  He indicated that she could frequently climb, balance, kneel, and crawl, and could occasionally

stoop and crouch.  R. 118.  He indicated that she would not have any manipulative, visual,

communicative, or environmental limitations.  R. 119-20.  He opined that the severity of her

symptoms was greater than expected and not consistent with the evidence.  R. 121.

   In February 2003, Reuben E. Brigety, M.D., completed another Physical Residual

Functional Capacity Assessment.  R. 124-31.  He came to the same conclusions as Dr. Collins with

respect to lifting, standing, walking, and sitting.  R. 125.  He indicated that Navarino would have

occasional limitations in climbing, R. 126, and needed to avoid concentrated exposure to hazards,

including heights, R. 128, but otherwise observed no limitations.  He concluded that the severity of

the symptoms was consistent with the medical evidence.  R. 129.

## IV.    STANDARD OF REVIEW.

   To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which has lasted or can be expected to last for a continuous period of not less

than twelve months.  42 U.S.C. §§ 423(d)(1)(A),1382c(a)(3)(A).  A "physical or mental

impairment" under the terms of the Act is one "that results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  In a case seeking

disability benefits under OASDI, the claimant also must show that he or she became disabled

before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. §

423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be

followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the

following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the
> economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions

leads to either the next question, or, on steps three and five, to a finding of disability.  A negative

answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030

(11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled

to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir.

2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the

Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with

sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.   ANALYSIS.

Navarino asserts five interrelated grounds supporting reversal. First, that the ALJ improperly analyzed her credibility. Second, that the ALJ failed to consider her impairments in combination. Third, that the ALJ improperly evaluated her pain. Fourth, that the ALJ failed to present a complete hypothetical to the VE. Fifth, that the ALJ should have referred her for a consultative psychological evaluation. These are the only issues I will address.[11]

Navarino contends that the ALJ erred by failing to make specific findings supporting his conclusion that her testimony about the limitations arising from pain and anxiety was not entirely credible. In this circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. This standard "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam) (quoting

---

[11] The parties were advised that issues not specifically raised would be considered waived. Doc. No. 17 at 2.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)). If proof of a disability is based upon

subjective evidence and a credibility determination is critical to the decision, "the ALJ must either

explicitly discredit such testimony or the implication must be so clear as to amount to a specific

credibility finding." *Foote*, 67 F.3d at 1562.  A clearly articulated credibility finding with

substantial supporting evidence in the record cannot be disturbed by a reviewing court.  *Dyer*, 395

F.3d at 1211-12; *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

The ALJ correctly applied this standard in assessing the functional limitations arising from

pain.  He found that Navarino had underlying medical conditions that could produce the pain and

subjective symptoms about which Navarino complained.  The ALJ explicitly discredited

Navarino's testimony because she "describes a series of symptoms that are far in excess of that

which is demonstrated by the medical evidence of record." R. 15.  In support of this conclusion,

the ALJ cited the opinions of Drs. Caraballo and Lower, who performed consultative

examinations, and the opinions of the reviewing physicians.

Dr. Caraballo opined that there was "no need for this patient to be off duty," despite her

complaints of pain. In his Medical Source Statement of Ability to do Work-Related Activities

(Physical), Dr. Lower opined that Navarino had the ability to perform specified exertional and

nonexertional activities despite her underlying impairments.  The reviewing physicians similarly

found that Navarino could perform exertional and nonexertional tasks, although to a greater degree

than Dr. Lower indicated she could do.  References to these physicians' conclusions and medical

records was a sufficient statement of the reasons supporting the ALJ's credibility determination.

Furthermore, taken together, these records and opinions provide substantial evidence supporting

-18-

the ALJ's conclusion that Navarino's testimony was not entirely credible with respect to the physical limitations arising from her impairments.

As to the mental limitations arising from Navarino's anxiety, however, the ALJ failed to follow the law in this circuit. In *Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir. 2005) (per curiam), the United States Court of Appeals for the Eleventh Circuit held that when a social security claimant makes a colorable claim of a mental impairment, the ALJ must either complete and append a psychiatric review technique form (PRTF) to his opinion or discuss the claimant's impairments in the four mental functional categories (activities of daily living; social functioning; concentration, persistence and pace; and, likelihood of decompensation) in his decision. Failure to do so requires remand. *Id.* (citing 20 C.F.R. § 404.1520a); *see also* 20 C.F.R. § 416.920a.

Anxiety is a mental impairment. Having found that Navarino's anxiety was severe, the ALJ erred by failing to complete and appended a PRTF form to his decision or to discuss his findings regarding mental functional limitations in his decision. Accordingly, remand is required for further development of the record.[12]

On remand, the Commissioner may wish to seek the services of a consulting psychologist or psychiatrist to develop the record more fully regarding the functional limitations arising from Navarino's anxiety. *See* 20 C.F.R. §§ 404.1517, 416.917; *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (per curiam) (holding that it may be reversible error not to order a consultative examination when one is necessary to make an informed decision).

_____

[12] Although Navarino did not specifically argue that the failure to prepare a PRTF or discuss the four functional limitations arising from mental impairment was error, she continually argued that the ALJ failed properly to assess the functional limitations arising from anxiety. Accordingly, I find that Navarino adequately preserved this issue for review.

After determining the functional limitations arising from Navarino's anxiety, the

hypothetical questions posed by the ALJ to a VE must be accurate and supportable on the record

and include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d

1561, 1562-63 (11th Cir. 1985) (per curiam). However, "the ALJ [is] not required to include

findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford v.

Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004) (per curiam).

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is

**REVERSED** under sentence four of 42 U.S.C. § 405(g), and the case is **REMANDED** for further

proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and,

thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 1, 2007.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties